# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 21-1554V

| | |
|---|---|
| DARCY WEIDNER,<br><br>　　　　　Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　Respondent. | Chief Special Master Corcoran<br><br>Filed: October 13, 2023 |

*David John Carney*, Green & Schafle LLC, Philadelphia, PA, for Petitioner.

*Katherine Carr Esposito*, U.S. Department of Justice, Washington, DC, for Respondent.

### DECISION AWARDING DAMAGES[1]

On July 7, 2021, Darcy Weidner filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered Guillain Barré syndrome ("GBS") as a result of receiving an influenza ("flu") vaccine on October 4, 2019. Petition at 1, ECF No. 1. The case was assigned to the Special Processing Unit of the Office of Special Masters, and although Respondent conceded entitlement, the parties could not informally resolve damages.

For the reasons set forth below, and after hearing argument from the parties, I find that Petitioner is entitled to compensation in the amount of **$163,000.00**, for actual pain and suffering.

---

[1] Because this unpublished Decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

I. **Relevant Procedural History**

Approximately one year after this case was initiated, Respondent filed a Rule 4(c) Report in July 2022 conceding that Petitioner was entitled to compensation. ECF No. 18. A Ruling on Entitlement was issued on the same day. ECF No. 19. The parties thereafter attempted to informally resolve damages but were unsuccessful. ECF No. 26. I issued a scheduling order on October 18, 2022, regarding the briefing of disputed damages issues. Non-PDF Order, docketed Oct. 18, 2022. The parties subsequently filed their respective briefs. ECF Nos. 28-30. I proposed that the parties be given the opportunity to argue their positions at a "Motions Day" hearing, at which time I would decide the disputed damages issue. ECF No. 33. The parties agreed and the hearing was held as scheduled on October 6, 2023.[3] ECF No. 34; Min. Entry, docketed Oct. 10, 2023. The disputed matter is now ripe for a determination.

II. **Relevant Medical History**

Petitioner's pre-vaccination medical history is relevant for Von Willebrand's disease (a blood clotting disorder) and chest palpitations. Petitioner was 19-years-old, working as a nursing assistant/aide, and had a one-year-old child at the time of her vaccination on October 4, 2019. Ex. 1 at 18; Ex. 2. Ten days post-vaccination, on October 14, 2019, Petitioner presented to the emergency room ("ER") but did not complain of GBS-type symptoms. Ex. 3 at 123-26.

Approximately one month later, on November 11, 2019, Petitioner returned to the ER complaining of severe diffuse lower back pain, fever, nausea, vomiting, lower left abdominal pain upon standing, and "some numbness diffusely throughout the left lower extremity." Ex. 3 at 181. She was admitted. *Id.* While hospitalized, on November 12, 2019, Petitioner underwent an MRI that revealed "L5-SI central minimal eccentric right paracentral HNP" but was otherwise unremarkable. *Id.* at 271-72. CT scans of Petitioner's lower extremities ("LEs") and abdominal pelvis were normal. *Id.* at 274. Petitioner was expected to be discharged when appropriate. *Id.* at 206.

However, while lying in the MRI on November 12, 2019, Petitioner "began to lose all sensation within [her] legs and fingers." Ex. 2 ¶ 10. Based on Petitioner's new complaints, she was transferred to a higher-level care facility (the neurology ICU) and admitted on November 13, 2019. Ex. 3 at 199; Ex. 4 at 27. Upon admission, Petitioner was assessed with "symmetrical bilateral weakness and numbness concerning for GBS,

---

[3] At the end of the hearing held on October 6, 2023, I issued an oral ruling from the bench on damages in this case. That ruling is set forth fully in the transcript from the hearing, which is yet to be filed with the case's docket. The transcript from the hearing is, however, fully incorporated into this Decision.

2

generalized lower back pain[.]" Ex. 4 at 29. A repeat MRI was unremarkable except for bulging discs. *Id.* at 34, 38.

The same day as her MRI, on November 13, 2019, Petitioner was seen by neurology. Ex. 4 at 38. Following an examination, the impression was noted as "possible [GBS]. Rule out other condition." *Id.* A lumbar puncture performed on November 14, 2019, showed no abnormalities. *Id.* at 34-35. Petitioner's neurologist recommended that Petitioner be transferred to another hospital for an EMG and "specialized care." *Id.*; Ex. 5 at 62. Petitioner was transported to another facility via ambulance and received hemodynamic monitoring and IVIG treatment during transport. Ex. 5 at 62.

The same day, November 14, 2019, Petitioner arrived at the third facility and an EMG did "not clearly reveal[] a primary neurogenic or myopathic process" (or otherwise confirm GBS). Ex. 5 at 62, 76, 155. She was told to continue IVIG (empirically), Gabapentin, and to begin physical and occupational therapies ("PT/OT"). *Id.* at 74, 76, 111. Petitioner underwent an initial PT/OT evaluation on November 15, 2019, and additional sessions of PT and OT were deemed necessary. *Id.* at 490-500.

On November 18, 2019, Petitioner underwent her final round of a five-day course of IVIG. Ex. 5 at 190. Following this treatment, she reported improvement in her weakness and "was able to ambulate by herself with some unsteadiness." *Id.* at 111. Petitioner was reassessed by PT/OT at this time, and she indicated a desire to continue at-home exercises instead of in-patient rehabilitation. *Id.* at 77, 118, 194. Petitioner was discharged with an order for home-health PT/OT services. *Id.* at 111, 183, 203. Three days later, on November 21, 2019, Petitioner returned to the ER complaining of an acute onset headache and "left calf pain for a few days." Ex. 3 at 312. An examination revealed normal strength in her UEs and LEs. *Id.* Petitioner was discharged. *Id.* at 313.

Petitioner had a follow-up with neurology on December 6, 2019. Ex. 5 at 596. She indicated she was "doing better" since discharge from the hospital and had regained some strength after participating in in-home PT but "unfortunately, she is feeling aches diffusely, in her legs, back and shoulders. This has worsened since her discharge." *Id.* She also noted daily headaches/weekly migraines and that Gabapentin was no longer helping. *Id.* Petitioner's neurologist's assessment indicated that Petitioner was "clinically recovering well" from her GBS. *Id.* at 600. Petitioner's Gabapentin dosage was increased and she was ordered to continue PT. *Id.*

Petitioner returned to work in January of 2020. On January 22, 2020, Petitioner presented to the ER complaining of a "syncopal episode while assisting with a central line insertion in [the] ICU." Ex. 3 at 374, 407. An examination revealed normal strength and sensation in UEs and LEs, intact cranial nerves, and 2+ patellar DTRs. *Id.* at 375. The

physician did not think Petitioner had a seizure but rather it was "[m]ore likely [Petitioner] has some lingering parasympathetic dysfunction from her recent [GBS] causing vasovagal syncope." *Id.* She received fluids and was discharged. *Id.*

The next day, on January 23, 2020, Petitioner followed up with neurology. Ex. 5 at 633. Petitioner's neurologist addressed Petitioner's GBS and wrote her "strength is intact today; [DTRs] have returned and are normal; her achy pain continues . . . [she was] advised to seek out [treatment at a] pain clinic for further pain control[; the neurologist] expect[s Petitioner's] pain will subside as she continues to heal." *Id.* at 636.

Petitioner experienced a second syncopal episode on February 14, 2020. Ex. 5 at 662. The ER physician noted that Petitioner "does have [a] recent history of [GBS,] which has been treated;" she was no longer receiving PT treatment. *Id.* at 662, 686, 693. Petitioner was assessed with syncope and collapse, with a concern for ventricular tachycardia, and she was admitted. *See id.* at 663-64, 668, 686, 693. While admitted, on February 15, 2020, Petitioner reported that she was "doing better from her [GBS]." *Id.* at 698. Petitioner was to wear a Holter monitor and continue her medications for GBS (Gabapentin and tramadol). *Id.* at 701. During an April 6, 2020 follow up with cardiology, Petitioner's treater opined it was "likely that her recent episode of [GBS] may be a precipitating factor for these episodes." Ex. 12 at 62, 79.

By June 19, 2020, Petitioner reported to her neurologist that her GBS-related pain was improving and "fairly mild at this point;" the pain was manageable with no medications (except OTCs). Ex. 14 at 43. A November 2, 2020 follow up visit with cardiology reveals that while Petitioner's cardiologist originally believed Petitioner's syncopal symptoms were "vasovagal in origin," it now appears Petitioner "might have some form of [supraventricular tachycardia]." Ex. 12 at 193.

On July 12, 2021, Petitioner had a follow-up with her neurologist complaining of "widespread pain following GBS, which we have been managing since then." Ex. 15 at 55. Petitioner's neurologist assessed her with chronic pain and "suspect[ed] fibromyalgia at this point." *Id.* at 58.

Approximately nine months later, on April 21, 2022, Petitioner returned to the ER for a severe headache/migraine. Ex. 16 at 158. An examination confirmed "baseline extremity sensory deficit due to [GBS]. Some right-sided facial numbness." *Id.* at 160. On May 13, 2022, Petitioner presented to a neurosurgeon for her recurring headaches present "since elementary school." Ex. 15 at 220-21. These headaches were occurring once per week and were associated with blurry vision, loss of vision, nausea and vomiting, facial weakness, elevated BP, and "pressure related" frontal headaches. *Id.* Petitioner indicated that she also had "bilateral paresthesias at times" but "no balance problems,"

and "chronic numbness and tingling in her upper [LE]" since having GBS, which all worsened during these headaches. *Id.* at 217, 221. The neurosurgeon felt that Petitioner's "symptoms are most related to ocular migraines or tension type headache." *Id.* at 221. A repeat MRI was recommended. *Id.* Additional medical records have not been filed.

Petitioner submitted affidavits describing the course of her illness and treatment. Exs. 2, 18. The affidavits indicate Petitioner continues to experience some sequalae of her GBS, including some numbness, weakness, tingling in her extremities, migraines, heart palpitations, shortness of breath, and fatigue. They also note that Petitioner had to cut back her hours at work, eventually causing her to leave her job in the ICU, she struggled to focus on schoolwork, and she could not care and play with her toddler for long periods of time as a result of her GBS-related symptoms.

### III.  Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). Petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

Special masters may consider prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in a specific

case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may also rely on my own experience adjudicating similar claims.[4] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. *See Graves v. Sec'y of Health & Hum. Servs.*, 109 Fed. Cl. 579 (2013).

### IV. Appropriate Compensation in this Matter

In this case, awareness of the injury is not disputed. Petitioner was a competent adult with no impairments that would impact her consciousness of her injury. Therefore, I analyze principally the severity and duration of the injury.

When performing this analysis, I review the record as a whole, including the medical records and affidavits filed, all assertions made by the parties in written documents, and the parties' arguments during the expedited damages hearing. Petitioner's medical records and affidavits provide a credible description of her GBS injury, with a moderately-severe acute phase of GBS, requiring presentation at the ER within roughly one month of vaccination; a six-day hospitalization; treatment at increasingly higher-level facilities; diagnostic procedures including MRIs, an EMG, CT, LP; one five-day course of IVIG treatment; discharge to in-home PT/OT; and continued use of Gabapentin. Petitioner showed and reported improvement after her initial treatment course. She was able to ambulate by herself, albeit with some unsteadiness, by the time of her hospital discharge on November 18, 2019, and by late January of 2020, her strength and DTRs were normal. Although I credit Petitioner's assertions that she currently continues to have ongoing sequelae of her GBS, including numbness and tingling throughout the body, her GBS recovery has been good overall – a fact supported by her medical records. *E.g.*, Ex. 5 at 596; Ex. 6 at 636.

I further give weight to Petitioner's argument (and Respondent's counter) that Petitioner's syncopal episodes during 2020 were originally thought by Petitioner's treaters to be related to her GBS, but that by November 2020, another explanation (supraventricular tachycardia) was believed to be a potential cause of such ongoing

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases were assigned to former Chief Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

symptoms. Petitioner's overall treatment course has therefore been moderate but lengthy compared to many. Her personal circumstances at the time of vaccination (being a young, single mother working full-time while attempting to go to nursing school) likely exacerbated the uncertainty surrounding her treatment course. Yet, Petitioner's case is not as severe as the worst GBS cases wherein petitioners remain non-ambulatory or significantly disabled.

In her briefings and during the damages hearing, Petitioner cites to a number of damages decisions involving GBS injuries and highlights the similarities between the petitioners in those cases and Petitioner. Motion at 1; Reply at 2.[5] Petitioner argues that an award of $175,000.00 is appropriate in this case. Motion at 1. Petitioner bases this request on her "initial presentation, long and intense treatment, lengthy hospital admission, extensive rehabilitation, and current and ongoing sequelae over three years later[.]" *Id.* at 18. Respondent, on the other hand, argues Petitioner suffered a more mild course of GBS than other cases,[6] due to her six-day hospitalization, discharge with the ability to ambulate, and no in-patient rehabilitation. Response at 11. As a result, Respondent proposes an award of only $97,500.00. *Id.*

Based upon the forgoing, and considering the parties' written and oral arguments, I find that Petitioner suffered a moderate GBS injury – although as a class, GBS injuries are distinguishable from many other kinds of common Program vaccine injuries. As I have noted in prior decisions, GBS constitutes a particularly frightening type of vaccine injury – and as a result, a higher-than-average pain and suffering award is appropriate. *See Gross v. Sec'y of Health & Hum. Servs.*, No. 19-0835V, 2021 WL 2666685 at *5 (Fed. Cl. Spec. Mstr. Mar. 11, 2021).

---

[5] In particular, Petitioner cited to W.*B. v. Sec'y of Health & Hum. Servs.*, No. 18-1634V, 2020 WL 5509686, at *4 (Fed. Cl. Spec. Mstr. Aug. 7, 2020) (awarding $155,000 for pain and suffering in a generally mild GBS case); *Dillenbeck v. Sec'y of Health & Hum. Servs.*, 17-428V, 2019 WL 4072069 (Fed. Cl. Spec. Mstr. July 29, 2019) (awarding $170,000 for past pain and suffering); *Devlin v. Sec'y of Health & Hum. Servs.*, No. 19-191V, 2020 WL 5512502 (Fed. Cl. Spec. Mstr. Aug. 7, 2020) (awarding $180,000 for pain and suffering); *McCray v. Sec'y of Health & Hum. Servs.,* No. 19-277V, 2021 WL 4618549 (Fed. Cl. Spec. Mstr. Aug. 31, 2021) (awarding $180,000 for pain and suffering); *Clemens v. Sec'y of Health & Hum. Servs.,* No. 19-1547V, 2022 WL 2288515 (Fed. Cl. Spec. Mstr. May 17, 2022) (awarding $180,000 for pain and suffering); *Fedewa v. Sec'y of Health & Hum. Servs.*, No. 17-1808V, 2020 WL 1915138 (Fed. Cl. Spec. Mstr. Mar. 26, 2020) (awarding $180,000 for pain and suffering); *Hernandez v. Sec'y of Health & Hum. Servs.,* No. 21-1572V, 2023 WL 3317354 (Fed. Cl. Spec. Mstr. Apr. 6, 2023) (awarding $192,000 for pain and suffering).

[6] In particular, Respondent cited to *Wilson v. Sec'y of Health & Hum. Servs.,* No. 20-588V, 2021 WL 5143925, at *4 (Fed. Cl. Spec. Mstr. Oct. 5, 2021) (awarding $175,000 for pain and suffering); *Bircheat v. Sec'y of Health & Hum. Servs.,* No 19-1088V, 2021 WL 3026880, at *3 (Fed. Cl. Spec. Mstr. June 16, 2021) (awarding $170,000 for pain and suffering); *Castellanos v. Sec'y of Health & Hum. Servs.,* No. 19-1710V, No. 19-1710V, 2022 WL 1482497, at *7 (Fed. Cl. Spec. Mstr. Mar. 30, 2022) (awarding $125,000 for pain and suffering); *Granville v. Sec'y of Health & Hum. Servs.,* No. 21-2098V, 2023 WL 6441388 (Fed. Cl. Spec. Mstr. Aug. 30, 2023) (awarding $92,500 for pain and suffering).

At the same time, however, the considerations that always impact how a pain and suffering award is calculated – level of pain, length of hospitalization and inpatient rehabilitation, degree and number of procedures for treatment, duration of treatment, and overall recovery – bear herein on the final figure to be awarded. Some GBS injuries feature permanent disabilities, while others are characterized by a better recovery. Here, Petitioner's GBS injury required moderate acute medical treatment, including one 5-day course of IVIG treatment and in-home PT/OT; it impacted her ability to care for her young child for over three years; and it caused her to leave a position as a nurse's aide in the hospital/ICU (which she loved) for an administrative position in a doctor's office. However, her subsequent condition is much improved, even accounting for some lingering deficits common to GBS's aftermath (numbness, tingling). I also accept that Petitioner had pre-existing comorbidities that would not necessarily be expected to improve following receipt of a flu vaccine and therefore Petitioner's clinical course and lingering sequelae may have been exacerbated by such comorbidities. The exacerbation of pre-existing comorbidities speaks to a higher award for pain and suffering.

I find the comparable damages determinations offered by Petitioner to be helpful, but many involve damage awards higher than what is warranted here. In such cases, where pain and suffering awards mainly ranged from $170,000.00 to $180,000.00, the injured parties experienced worse prognoses subsequent to the initial hospitalizations, and continued to require medication for pain specifically related to the GBS. *See Dillenbeck v. Sec'y of Health & Hum. Servs.*, 17-428V, 2019 WL 4072069, at *14 (Fed. Cl. Spec. Mstr. July 29, 2019); *Fedewa v. Sec'y of Health & Hum. Servs.,* No. 17-1808V, 2020 WL 1915138, at *6 (Fed. Cl. Spec. Mstr. Mar. 26, 2020). In cases where more than $175,000.00 was awarded for pain and suffering, petitioners tend to experience ongoing true GBS-related issues, more than expected sequelae. And many faced permanent limitations on the nature of the work they could perform. I recognize that Petitioner has some long-lasting sequelae from her GBS, but they do not appear to be as severe as those cases cited by Petitioner. In fact, Petitioner's neurologist specifically stated that Petitioner was recovering well. *See,* e.g., Ex. 5 at 596.

Additionally, at the expedited hearing, Petitioner primarily relied on the *Hernandez* case – in which the petitioner received a past pain and suffering award in the amount of $192,000.00 due to the impact on the petitioner's ability to parent her three young children and care for her father-in-law who had suffered a stroke – to support her request for past pain and suffering. No. 21-1572V, 2023 WL 3317354 (Fed. Cl. Spec. Mstr. Apr. 6, 2023). While Petitioner's ability to care for her young child was likewise impacted by her GBS, it does not appear to have been to the same extent as *Hernandez*. Petitioner was never wheelchair bound, there is no evidence that she required *substantial* assistance with her activities of daily living, and she returned to work and driving within a few months of onset, whereas, for example, *Hernandez* could not drive for three years.

Respondent's proposed comparables, however, are less helpful, since they do not provide a basis on which to rely on for an award below $100,000.00 in a GBS case. At best, Respondent cited *Granville v. Sec'y of Health & Hum. Servs.,* wherein the petitioner received $92,500.00 in past pain and suffering (although the sum awarded therein is less than what Respondent proposes). No. 21-2098V, 2023 WL 6441388 (Fed. Cl. Spec. Mstr. Aug. 30, 2023). But Petitioner ought to be awarded more than in *Granville*. While both petitioners received similar initial treatment courses (including five and six-day hospitalizations and five-day courses of IVIG), the *Granville* petitioner admittedly "fully recovered" within seven months of hospitalization, whereas Petitioner still experiences some lingering sequelae. Further, there is no evidence that *Granville* involved a single mother caring for a young child during her treatment course – a factor favoring a higher award. The other closer comparable offered by Respondent, *Castellanos*, is also distinguishable because that petitioner only narrowly satisfied the six-month severity requirement, and therefore had a much shorter injury course – reflected by a lower award. No. 19-1710V, No. 19-1710V, 2022 WL 1482497, at *7 (Fed. Cl. Spec. Mstr. Mar. 30, 2022).

As noted during the hearing, I deemed the *Gruba* case – involving a past pain and suffering award of $165,000.00 – to also be instructive. No. 19-1157V, 2021 WL 1925630 (Fed. Cl. Spec. Mstr. Apr. 13, 2021). Like Petitioner herein, the *Gruba* claimant had a moderate acute phase, with presentation to her PCP within six weeks of vaccination, followed by a hospital stay, and IVIG; she treated for approximately three years; and she has long-term residual numbness attributed to her GBS. That petitioner had to leave her job at a childcare facility because she was unable to handle the physical demands of her position and could no longer receive future vaccinations as a result of her GBS. Both petitioners therefore experienced real-life implications of their injury in terms of employment. *Gruba* is distinguishable somewhat, since that claimant underwent a ten-day hospitalization, followed by an additional nine days of in-patient rehabilitation. Petitioner's hospitalization was shorter than *Gruba's,* and she did not require in-patient rehabilitation *at all.* These differences dictate that Petitioner should be awarded *slightly* less than the *Gruba* petitioner, while still taking into account Petitioner's circumstances of being a young single mother throughout her injury course.

For these reasons, I do not find that the GBS injury and its sequelae were of such high severity to justify an award of the magnitude requested by Petitioner. The actual pain and suffering component will nonetheless be larger than in many vaccine injury cases, simply for the reason (as I stated at hearing) that the severe and frightening quality of an immune-mediated injury like GBS warrants commensurate damages. But the fact that *this* case of GBS was a bit less severe than comparable instances means that the actual award should be *slightly* lower. I therefore award actual pain and suffering of $163,000.00.

## V.     CONCLUSION

In light of all of the above, I award **Petitioner a lump sum payment of $163,000.00**, **(representing compensation for actual pain and suffering) in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a) of the Vaccine Act. *Id*.

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[7]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[7] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.